1 | Mitchell J. Popham (SBN: 126194)
mpopham@lockelord.com
2 | Nina Huerta (SBN: 229070)
nhuerta@lockelord.com
3 | LOCKE LORD BISSELL & LIDDELL LLP
4 | 300 South Grand Avenue, Suite 2600
Los Angeles, California 90071
5 | Telephone:    213-485-1500
Facsimile:    213-485-1200
6

E-filing

7 | Attorneys for Defendant
BRIT UW LTD., UNDERWRITING AT LLOYD'S,
8 | LONDON UNDER THE NAME OF BRIT SYNDICATE 2987

FILED

APR - 8 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9 | Michele Miller (SBN: 213723)
mm@artisanlaw.com
10 | MCKAGUE & TONG, LLP
11 | 250 Montgomery Street, Suite 1400
San Francisco, CA 94104
12 | Telephone:    (415) 409-5222
Facsimile:    (415) 409-0467
13

14 | Attorneys for Defendant
ALTAROCK ENERGY, INC.
15

EMC

16 |                    UNITED STATES DISTRICT COURT

17 |                    NORTHERN DISTRICT OF CALIFORNIA

18 |                    CV 11        1749

19 | NORTHERN CALIFORNIA POWER           ) CASE NO.
AGENCY, a joint powers agency,       )
20 |                                     ) NOTICE OF REMOVAL TO FEDERAL
21 |                                     ) COURT
                  Plaintiff,           )
22 |                                     ) [28 U.S.C. § 1332]
           vs.                         )
23 |                                     )
                                       )
24 | ALTAROCK ENERGY, INC., a Delaware   ) [Removal from the Superior Court of California,
corporation; LLOYD'S OF LONDON; DOES ) Marin County, Case No. CIV 1101102]
25 | 1 through 10,                       )
                                       )
26 |                  Defendants.       )
                                       ) Complaint Filed: March 2, 2011
27 |
28

1

NOTICE OF REMOVAL TO FEDERAL COURT
Northern California Power Agency v. AltaRock Energy, Inc., et al.

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

ORIGINAL

FAXED
FIRST LEGAL SUPPORT SERVICES

1    **TO THE CLERK OF THE ABOVE-ENTITLED COURT, ALL INTERESTED**

2    **PARTIES AND THEIR ATTORNEYS OF RECORD:**

3        Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant Brit UW Ltd., underwriting at

4    Lloyd's, London under the name of Brit Syndicate 2987 ("Brit") and Defendant AltaRock Energy,

5    Inc. ("AltaRock") (hereinafter, collectively "Defendants") hereby remove this action from the

6    Superior Court of California, County of Marin, to the United States District Court for the Northern

7    District of California and state as follows:

8                            **STATEMENT OF THE CASE**

9        1.      On March 2, 2011, plaintiff Northern California Power Agency ("Plaintiff")

10   commenced an action in the Superior Court of California, Marin County, entitled *Northern*

11   *California Power Agency v. AltaRock Energy, Inc., et al.*, Case No. CIV 1101102 (the "State Court

12   Action"). A true and accurate copy of the Summons, Civil Cover Sheet, Proof of Service, and

13   Complaint in the State Court Action are attached hereto as *Exhibits 1*.

14       2.      Defendants have attached to this Notice of Removal all state court pleadings or orders

15   served on Defendants as of the date of this filing.

16                            **DIVERSITY JURISDICTION**

17       3.      A case may be removed to a federal court if it could have been brought in that federal

18   court originally. 28 U.S.C. § 1441(b); *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 474

19   (1998).

20       4.      This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because there is

21   complete diversity of citizenship between Plaintiff and all Defendants and more than $75,000,

22   exclusive of interest and costs, is at stake.

23       5.      Plaintiff is an agency formed under the laws of California and is a citizen of

24   California.

25       6.      None of the Defendants in this action are now, or at the time of the filing of the

26   Complaint were, a citizen of California.

27       7.      Brit is a company organized under the laws of England and Wales with its principal

28   place of business in London, England.

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

2

1      8.      AltaRock is a Delaware corporation with its principal place of business in the State of

2 Washington. AltaRock's "high level officers direct, control, and coordinate the corporation's

3 activities" out of its office located in Seattle, Washington. *Hertz Corp. v. Friend*, __ U.S.__, 138

4 S.Ct. 1181 (2010). Accordingly, AltaRock is not a citizen of California.

5      9.      Finally, it is "more likely than not" that the amount in controversy exceeds $75,000.

6 *See Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996). Plaintiff alleges in its

7 Complaint that Defendants have caused financial harm to Plaintiff of approximately $7,500,000.

8 Therefore, more than $75,000 is at issue in this case.

9                           **REMOVAL REQUIREMENTS**

10      10.      The undersigned counsel represent Brit and AltaRock. Upon information and belief,

11 no other defendants have been served with the Complaint in this matter, and therefore additional

12 consent to this removal is not required. *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1

13 (9th Cir. 1988) (requirement for consent applies "only to defendants properly joined and served in

14 the action").

15      11.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1441(a), because the Northern

16 District of California is the federal judicial district embracing the Superior Court of California for

17 the County of Marin, where the State Court Action was originally filed.

18      12.      Pursuant to Local Rule 3-2(d), this case should be assigned to the either the San

19 Francisco or Oakland divisions because it is a civil action that arose in the County of Marin.

20                               **CONCLUSION**

21      By this Notice of Removal and the associated attachments, Defendants do not waive any

22 objections they may have as to service, jurisdiction or venue, or any other defenses or objections

23 they may have to this action. Defendants intend no admission of fact, law or liability by this Notice,

24 and expressly reserve all defenses, motions and/or pleas.

25      **WHEREFORE**, Defendants pray that the State Court Action be removed to this Court, that

26 all further proceedings in the State Court Action be stayed, and that Defendants receive all additional

27 relief to which they are entitled.

28

NOTICE OF REMOVAL TO FEDERAL COURT
*Northern California Power Agency v. AltaRock Energy, Inc., et al.*

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1 Dated: April 8, 2011                    LOCKE LORD BISSELL & LIDDELL LLP

2

3                                         By: _____

4                                                 Mitchell J. Popham
                                                  Nina Huerta
5                                         Attorneys for Defendant
                                          BRIT UW LTD., UNDERWRITING AT LLOYD'S,
6                                         LONDON UNDER THE NAME OF BRIT
                                          SYNDICATE 2987
7

8 Dated: April 8, 2011                    MCKAGUE & TONG, LLP

9

10                                        By: _____

11                                                Michele Miller
                                          Attorneys for Defendant
12                                        ALTAROCK ENERGY, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA 669549v.2                    NOTICE OF REMOVAL TO FEDERAL COURT
                        *Northern California Power Agency v. AltaRock Energy, Inc., et al.*

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

EXHIBIT 1

RECEIVED

MAR 16 2011

Name William D'Cunich

Signature

7/6696

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**FILED**

MAR - 2 2011

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: C. Lucchesi, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ALTAROCK ENERGY, INC., a Delaware corporation; LLOYD'S OF LONDON;
DOES 1 through 10,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
NORTHERN CALIFORNIA POWER AGENCY, a joint powers agency

**CASE NUMBER:**
*(Número del Caso)*
CIV 1101102

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Marin County Superior Court<br>3501 Civic Center Drive<br>Room 116<br>San Rafael, CA 94903 | CASE NUMBER:<br>*(Número del Caso)*<br>CIV 1101102 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Geoffrey Spellberg SBN121079 /Kevin E. Gilbert SBN209236
Meyers Nave (415) 421-3711
575 Market Street, Suite 2600, San Francisco CA 94105

| DATE:<br>*(Fecha)* MAR 2 2011 | KIM TURNER | Clerk, by<br>*(Secretario)* | G. LUCCHESI | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Lloyd's of London
   under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☒ by personal delivery on *(date):*

Page 1 of 1

[SEAL]

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|---|

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Geoffrey Spellberg SBN 121079/Kevin Gilbert SBN 209236<br>Meyers Nave<br>575 Market Street, Suite 2600<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415-421-3711   FAX NO.: 415-421-3767<br>ATTORNEY FOR *(Name)*: Plaintiff Northern California Power Agency | RECEIVED<br>MARIN COUNTY<br>SUPERIOR COURT<br><br>2011 MAR -2  P 12: 58 |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Marin**
STREET ADDRESS: 3501 Civic Center Drive
MAILING ADDRESS: Room 116
CITY AND ZIP CODE: San Rafael, CA 94903
BRANCH NAME:

CASE NAME: NORTHERN CALIFORNIA POWER AGENCY v. ALTAROCK
ENERGY, INC., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☒ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | CIV 1101102<br>JUDGE: Chernus<br>DEPT: B |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☒ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☒ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action *(specify)*: 4
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 2, 2011

Geoffrey Spellberg
_____
(TYPE OR PRINT NAME)                              ►          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, Bar number, and address):<br>Geoffrey Spelberg, SBN 121079<br>Meyers Nave<br>575 Market Street, Suite 2600<br><br>TELEPHONE NO.: 415-421-3711    FAX NO. (Optional): 415-421-3767<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): Plaintiff Northern California Power Agency, a joint powers | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
   STREET ADDRESS: 400 McAllister Street
   MAILING ADDRESS: Room 103
   CITY AND ZIP CODE: San Francisco, CA 94102
   BRANCH NAME: Civil Division

| | |
|---|---|
| PLAINTIFF/PETITIONER: NORTHERN CALIFORNIA POWER AGENCY<br><br>DEFENDANT/RESPONDENT: ALTAROCK ENERGY, INC., a Delaware corporation | CASE NUMBER:<br>CIV110110 2 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

**ORIGINAL**

*(Separate proof of service is required for each party served.)*

At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

  a. ☒ summons
  b. ☒ complaint
  c. ☒ Alternative Dispute Resolution (ADR) package
  d. ☒ Civil Case Cover Sheet *(served in complex cases only)*
  e. ☐ cross-complaint
  f. ☐ other *(specify documents):*

3. a. Party served *(specify name of party as shown on documents served):*

  b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served: 2320 Marinship Way, Suite 300, Sausalito, CA

5. I served the party (check proper box)
  a. ☐ by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*       (2) at *(time):*
  b. ☐ by substituted service. On *(date):*    at *(time):*    I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

    (1) ☑ (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

    (2) ☐ (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

    (3) ☐ (physical address unknown) a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

    (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*    from *(city):*    or ☐ a declaration of mailing is attached.

    (5) ☐ I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

| PLAINTIFF/PETITIONER: NORTHER.. CALIFORNIA POWER AGENCY | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: ALTAROCK ENERGY, INC., a Delaware corporation | |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*:                      (2) from *(city)*:

    (3) ☐  with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

    (4) ☐  to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐  **by other means** *(specify means of service and authorizing code section)*:

      ☐  Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. ☐  as an individual defendant.
  b. ☐  as the person sued under the fictitious name of *(specify)*:
  c. ☐  as occupant.
  d. ☐  On behalf of *(specify)*:
      under the following Code of Civil Procedure section:

      ☐ 416.10 (corporation)            ☐ 415.95 (business organization, form unknown)
      ☐ 416.20 (defunct corporation)       ☐ 416.60 (minor)
      ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
      ☐ 416.40 (association or partnership)     ☐ 416.90 (authorized person)
      ☐ 416.50 (public entity)             ☐ 415.46 (occupant)
                                           ☐ other:

7. Person who served papers
  a. Name:    *LARRY CHIESA*
  b. Address:  *BIG CLOAA*
  c. Telephone number:  *415-777-4640*
  d. The fee for service was: $
  e. I am:
    (1) ☑  not a registered California process server.
    (2) ☐  exempt from registration under Business and Professions Code section 22350(b).
    (3) ☐  a registered California process server:
      (i) ☐ owner ☐ employee ☐ independent contractor.
      (ii) Registration No.:
      (iii) County:

8. ☑ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date:

*Larry Chiesa*                        ▶ *(signature)*
_____       _____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)      (SIGNATURE)

American LegalNet, Inc.
www.FormsWorkflow.com

1 | Geoffrey Spellberg, Esq. (SBN: 121079)
gspellberg@meyersnave.com
2 | Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@meyersnave.com
3 | MEYERS, NAVE, RIBACK, SILVER & WILSON
575 Market Street, Suite 2600
4 | Telephone: (415) 421-3711
Facsimile: (415) 421-3767
5
Attorney for Plaintiff
6 | NORTHERN CALIFORNIA POWER AGENCY

PUBLIC ENTITY
NO FEE

FILED

MAR - 2 2011

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: C. Lucchesi, Deputy

7

8 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | IN AND FOR THE COUNTY OF MARIN

10 | NORTHERN CALIFORNIA POWER AGENCY, | Case No: CIV 1101102
a joint powers agency,
11 | | COMPLAINT FOR NEGLIGENCE AND
Plaintiff, | DECLARATORY RELIEF
12
v.
13
ALTAROCK ENERGY, INC., a Delaware
14 | corporation; LLOYD'S OF LONDON; DOES 1
through 10,
15
Defendants.
16

17 |     Plaintiff Northern California Power Agency ("NCPA") files this complaint and alleges as

18 | follows:

19 | **THE PARTIES**

20 |     1.     NCPA is a California Joint Powers Agency formed pursuant to the California Joint

21 | Exercise of Powers Act and is comprised of 17-member communities. Each of the member

22 | communities has the power to purchase, generate, transmit, distribute, sell and interchange electric

23 | energy in addition to other powers which are common to each of them. NCPA generates power

24 | for its members and also sells power into the California Power Grid system. NCPA owns and

25 | operates a number of power-generating facilities, including hydro-electric, gas turbine generation

26 | and geothermal. The geothermal steam generation facilities owned and operated by NCPA are

27 | called "the Geysers" and are located in Lake County, California.

28 |     2.     Defendant AltaRock Energy, Inc. ("AltaRock") is a Delaware corporation which is

Complaint for Negligence and Declaratory Relief                                    Case No.
1595295                                         1

1       2.      Defendant AltaRock Energy, Inc. ("AltaRock") is a Delaware corporation which is

2  authorized to and does transact business in the state of California. Its California headquarters and

3  principal place of business are located in Sausalito, Marin County, California.

4       3.      Lloyd's of London is an insurance company that provides underwriting insurance

5  throughout the United States. It provided "Control of Well" insurance on the project at issue here

6  and that insurance is applicable to the damages caused to the well at issue here.

7       4.      Defendant Does 1 through 10 are sued herein by these fictitious names. Plaintiff is

8  presently unaware of the true names and capacities of these Doe defendants and will seek leave of

9  court to amend this complaint to allege the true names and capacities of these Doe defendants if

10  and when such names become known. Plaintiff is informed and thereon alleges that each Doe

11  defendant was responsible together with every other named defendant for each and every act or

12  omission alleged herein and that each Doe defendant was the agent, servant, employee,

13  representative or joint venturer of every other defendant and, in doing the acts complained of

14  herein, each defendant was acting within the scope of said agency, employment, representation

15  and/or joint venture.

16                                         **VENUE**

17       5.      Venue is proper in Marin County as the principal place of business for defendant

18  AltaRock is located in Marin County at 2320 Marinship Way, Suite 300, Sausalito, CA 94965.

19                               **GENERAL ALLEGATIONS**

20            **The Demonstration and Development Agreement and the Underlying Facts**

21       6.      AltaRock is a geothermal energy technology development company which claims

22  that it has developed an enhanced steam production system called Engineer Geothermal Systems

23  ("EGS"). AltaRock approached NCPA representing that this EGS technology could be used to

24  enhance and improve the steam generating capabilities of the NCPA geothermal facility.

25       7.      Based upon the representations by AltaRock that this technology could potentially

26  improve the energy output from the Geysers' facility, AltaRock and NCPA entered into a written

27  agreement called the "Demonstration and Development Agreement." A true and correct copy of

28  that agreement is attached hereto as Exhibit A.

---

Complaint for Negligence and Declaratory Relief                 Case No.
1595295                                 2

1    8.    The parties entered into that agreement on or about May 20, 2009. Under the terms
2  of the agreement, AltaRock agreed to implement the EGS technology into an existing NCPA
3  injection well, identified as Well E-7. In so doing, AltalRock proposed to widen and deepen that
4  injection well. In addition, AltaRock agreed to drill an additional well for NCPA which would
5  also utilize the EGS technology. That proposed new well was to be identified as Well E-8.

6    9.    Under the agreement, if AltaRock's demonstration of its EGS technology on Well
7  E-7 and anticipated Well E-8 was successful and economically viable, the parties would consider
8  and potentially negotiate additional agreements under which AltaRock would provide its EGS
9  technology to improve output from other wells in the Geysers geothermal fields.

10    10.    The drilling/deepening effort on Well E-7 by AltaRock was essentially a disaster
11  and Well E-8 was never drilled. AltaRock had previous experience drilling in the California
12  Imperial Valley but was inexperienced with drilling in Lake County or other areas with similar
13  soil conditions. At the Geysers, there is an approximate 4,000 – 4,500 foot layer of cap rock that
14  contains pockets of serpentine and/or melange. These pockets are unstable and tend to collapse
15  bore holes that have been drilled through the pockets. Accordingly, the critical drilling technique
16  requires drilling through the capstone in short segments and cementing casing in place in the bore
17  hole to prevent collapse of the bore hole. This critical drilling technique was discussed numerous
18  times with AltaRock before and during the drilling effort.

19    11.    All parties were aware that before AltaRock began its deepening effort that there
20  was a caliper tool lodged in the E-7 bore hole. To address that issue, AltaRock drilled a window
21  through the existing casing just above the caliper and began drilling through the cap rock to the
22  steam reservoir. However, despite being specifically advised about the unstable soil and the need
23  to install casing in short segments, AltaRock attempted to drill through to the steam reservoir over
24  2,000 feet below without inserting support casing at reasonable intervals. As a consequence,
25  AltaRock's bore holes kept collapsing on the drill mechanism.

26    12.    Initially AltaRock placed a bridge and cement plug above the caliper and began a
27  side track bore hole. AltaRock made this effort twice and both bore holes collapsed due to
28  AltaRock failing to utilize the correct drilling technique. One borehole reached approximately

1 | 3,576 feet and the other at 4,434 feet. During those failures, AltaRock left a piece of pipe in the
2 | bore hole, effectively blocking it.

3 |     13.    After those two failures, AltaRock placed a second bridge and plug higher in the
4 | well and then cut another window in the existing casing and began drilling through another side
5 | track bore hole, again failing to use the appropriate technique for the soil conditions, AltaRock
6 | was only able to drill to 4,175 feet and then 4,262 feet in two separate side track bore holes. Both
7 | bore holes collapsed and AltaRock abandoned drill pipe in each bore hole, blocking each.

8 |     14.    After those two bore holes collapsed, AltaRock intentionally broke its well string
9 | leaving material and equipment in the bore hole. NCPA alleges on information and belief that
10 | AltaRock ceased working on this project because it was over budget and was intending to
11 | commence a more lucrative project in Oregon for which it had received a $20 million grant from
12 | the Department of Energy.

13 |     15.    The actions by AltaRock in utilizing improper drilling techniques and then refusing
14 | to correct the harm it had caused destroyed all the commercial value that NCPA had previously
15 | received from Well E-7. The well had been previously used as an injection well (i.e., although the
16 | well was not producing steam energy itself, water was injected into this well and percolated to
17 | other active wells where it was captured as steam energy). The injection of relatively clean water
18 | created steam energy that contained substantially less impurities than the steam created from the
19 | existing underground waters and because of the lower impurities, provided a higher energy yield.
20 | Thus, by destroying the ability of Well E-7, to function as a steam injection well, the resulting
21 | energy output from the steam field was reduced because of the increase in non-condensable gases
22 | which in turn have reduced the efficiency of the energy production, and hence the value of the
23 | asset.

24 |     16.    By effectively destroying the utility and function of Well E-7, AltaRock has caused
25 | financial harm to NCPA calculated as at least $4-6 million which is the cost to drill a replacement
26 | well plus an approximate additional $1 million annually to mitigate the effect of the non-
27 | condensable gases discussed above. Further, the cost to properly "abandon" Well E-7 - is
28 | approximately $500,000.

Complaint for Negligence and Declaratory Relief          Case No.
1595295                          4

1                                             **THE ESCROW AGREEMENT**

2         17.     When the parties entered into the Demonstration and Development Agreement,

3 NCPA agreed to a request by AltaRock that AltaRock be released from its obligation to post a

4 payment bond under California Civil Code §3214 *et seq.* Instead, NCPA agreed to AltaRock's

5 request that AltaRock instead place $5 million into a joint escrow account and that money would

6 be held pending final resolution of the project and all issues related thereto. A true and correct

7 copy of the Escrow Agreement is attached hereto as Exhibit B.

8         18.     Pursuant to the recitals set forth at Sections A and C on the first page of the Escrow

9 Agreement, the money is held in escrow and is to be used for "the payment of (i) any claims by

10 NCPA for property damage relating to said Wells E-7 and E-8 that are not otherwise covered by

11 insurance maintained by AltaRock, or (ii) any claim by third parties for property damage or other

12 liability resulting from induced seismicity that is determined by the parties to have been

13 specifically caused by AltaRock's activities in drilling Wells E-7 and E-8." AltaRock did obtain a

14 "Control of Well" policy from defendant Lloyd's of London, a copy of which is Exhibit D hereto.

15         19.     As discussed above, as a result of AltaRock's negligence, Well E-7 was damaged

16 and its functionality completely destroyed.

17         20.     The Escrow Agreement was amended by the parties on or about May 21, 2009. By

18 that amendment, a new §1.3 replaced the then existing §1.3. That amended section is attached

19 hereto as Exhibit C. That replacement section still requires AltaRock assure that insurance

20 coverage pay for the damages caused to NCPA by AltaRock's negligence.

21         21.     NCPA has demanded that AltaRock either correct the damage to Well E-7 that it

22 caused or comply with its obligation to assure that insurance monies are paid to NCPA to

23 reimburse for the damages caused by AltaRock. Despite numerous demands, AltaRock has

24 refused to comply with its contractual obligations and it will not correct the damage nor assure

25 reimbursement to NCPA through the Lloyd's insurance policy.

26                                        **THE INSURANCE AGREEMENT**

27         22.     AltaRock was obligated under the agreement between the parties to obtain an

28 Operator's Extra Expense policy and name NCPA as an additional insured on that policy to

Complaint for Negligence and Declaratory Relief         Case No.
1595295                      5

1 │ protect NCPA for any damage caused to Well E-7. AltaRock did obtain an Insurance Policy, a

2 │ copy of which is attached hereto as Exhibit D.

3 │      23.     On that Policy, NCPA is named as a loss payee at Endorsement No. 14 as required

4 │ under ¶12.1(d) to the contract. The relevant coverage provision is at section 1B which provides

5 │ that the insurer will reimburse for actual costs and expense incurred to restore or redrill a well

6 │ insured or any part thereof, which has been lost or otherwise damaged as a result of an Occurrence

7 │ giving rise to a claim. The term "occurrence" is defined as an unexpected and unintended casualty

8 │ or series of losses, disasters or casualties.

9 │      24. ᵧ    The damage to Well E-7 caused by AltaRock's actions constitutes an occurrence

10 │ and, as such, NCPA as a named loss payee has made demand for coverage from Lloyd's.

11 │ Although Lloyd's has requested and received further additional information from NCPA, Lloyd's

12 │ has refused and continues to refuse to provide the coverage and reimbursement to NCPA that it is

13 │ required to provide under the policy.

14 │      25.     The contract dispute between NCPA and AltaRock is currently in arbitration

15 │ pursuant to the terms of the contract between the parties. However, the negligence issues are not

16 │ before the arbitrator nor are the insurance coverage issues. Further, the arbitrator does not have

17 │ jurisdiction over Lloyd's of London. Accordingly, this Superior Court action is brought to

18 │ determine the obligation of Lloyd's to provide reimbursement to NCPA based upon the negligent

19 │ conduct by AltaRock.

20 │ <div align="center">**FIRST CAUSE OF ACTION**</div>

21 │ <div align="center">**(Negligence against AltaRock)**</div>

22 │      26.     The allegations of paragraphs 1 through 25 are incorporated herein by this

23 │ reference.

24 │      27.     AltaRock agreed to and was obligated to provide skilled and competent drilling

25 │ services at Well E-7. Pursuant to paragraph 2.2 of the Development and Demonstration

26 │ Agreement, AltaRock was to deepen existing Well E-7 and create a new EGS reservoir associated

27 │ with the Well and test the economic viability of producing commercial quantities of geothermal

28 │ fluids from the heat source contained in the new EGS reservoir.

28. AltaRock, directly and through its sub-contractors, failed to perform the required drilling operations in a competent and acceptable fashion. Specifically, AltaRock, intentionally and continuously failed to implement and follow proper drilling procedures which resulted in numerous collapses of the bore hole and ultimately the complete abandonment of the work. The failure by AltaRock to implement and follow the proper drilling procedures was below the standard of care required for a project of this type and so AltaRock's actions constitute negligence.

29. After failing to follow proper drilling procedures and suffering a series of bore hole collapses and running substantially over budget, AltaRock decided to abandon the drilling effort and left portions of its drilling line in the borehole. Due to that action and AltaRock's placement of two cement plugs and its failure to correct and close the openings it made in the pre-existing Well E-7 casing while leaving parts of its drilling line in the bore holes, the well has lost all use and functionality. All of the above described conduct constitutes a breach of the duty of care that AltaRock owed to NCPA and establishes negligence on the part of AltaRock.

30. As a result of the above-described breaches of the duty of care, AltaRock is negligent and as a legal and proximate cause of that negligence, NCPA suffered and continues to suffer harm and incur monetary damages.

31. NCPA has suffered damages in an amount that is in excess of the jurisdictional minimum of this Court. Those damages include the cost of drilling a replacement well (E-8) which is approximately $4-6 million, plus the projected cost to properly abandon the now useless Well E-7 which is approximately $500,000, and the cost of reducing the non-condensable gases which is approximately $1 million annually.

## SECOND CAUSE OF ACTION

### (Declaratory Relief Against Both Defendants)

32. The allegations of paragraphs 1 through 31 are incorporated herein by this reference.

33. As described herein, under the terms of the escrow agreement, defendant AltaRock is required to provide full insurance coverage by an OEE policy which will pay for any damages caused to NCPA's property by AltaRock's actions.

34. AltaRock obtained an insurance policy from defendant Lloyd's of London. A true

Complaint for Negligence and Declaratory Relief    Case No.
1595295                                              7

1    and correct copy of that insurance policy is attached hereto as Exhibit D.

2         35.     Under the relevant terms of the escrow agreement, AltaRock was to assure that this

3    Lloyd's insurance policy would cover and pay for the cost of re-drilling a new well, abandoning

4    Well E-7 and mitigating the non-condensable gas problem described above.

5         36.     NCPA as a named loss payee has made demand on Lloyd's under this policy and

6    that demand has been ignored and denied by Lloyd's.

7         37.     A dispute has arisen between all three parties regarding Lloyd's obligation to

8    provide insurance coverage to NCPA under this insurance policy.

9         38.     NCPA asserts that it is entitled to full coverage under the policy which includes

10    paying to NCPA the reimbursement costs to completely remediate the damage caused by

11    AltaRock's negligence. That damage includes $4-6 million to drill the replacement Well E-8, $1

12    million annually to mitigate the non-condensable gas issue and approximately $500,000 to

properly abandon Well E-7.

13         39.     AltaRock and Lloyd's both assert that the policy is not applicable here and so

14    Lloyd's does not have any obligation to pay any amounts to NCPA under the insurance policy

15    which is attached as Exhibit D.

16         40.     As a result of this dispute between the parties, NCPA seeks a declaration under

17    C.C.P. §1060 that AltaRock's negligence caused an occurrence under the policy causing harm to

18    NCPA which entitles NCPA to full coverage and full payment from Lloyd's for the damages that

19    NCPA has incurred and will incur.

20                              **THIRD CAUSE OF ACTION**

21                        **(Breach of Contract against Lloyd's)**

22         41.     The allegations of paragraphs 1 through 40 are incorporated herein by this

23    reference.

24         42.     As set forth at Endorsement No. 14 to the policy, NCPA is a loss payee on the

25    policy. As a result, it has first party contractual rights vis-à-vis Lloyd's.

26         43.     Under the terms of the policy, Lloyd's is obligated to provide full coverage and pay

27    all amounts necessary to reimburse NCPA for the damages described herein.

28         44.     NCPA has made demand on Lloyd's and Lloyd's has refused thereby breaching the

---

Complaint for Negligence and Declaratory Relief             Case No.
1595295                         8

1 | contract here.

2 | 45. Based upon the above breach of contract, NCPA has suffered damages in an
3 | amount that is in excess of the jurisdictional limit of this Court but which is described herein as
4 | damages for well redrilling/replacement, mitigation of the condensable gas issue and abandonment
5 | of Well E-7.

## FOURTH CAUSE OF ACTION

### (Negligence against AltaRock)

46. The allegations of paragraphs 1 through 45 are incorporated herein by this
reference.

47. Under ¶12.1(d), AltaRock was obligated to maintain an operator's extra expense
policy in the amount of $10 million to cover any extra expenses which might be incurred by
NCPA for any damage arising from this project.

48. AltaRock obtained and provided to NCPA the policy which is attached as Exhibit
D hereto. AltaRock initially provided a short two-page summary of the policy (the first two pages
of Exhibit D). The full policy that is attached as Exhibit D is entitled "Control of Well Insurance
Certificate."

49. To the extent that this Control of Well Insurance policy is not a proper OEE policy,
AltaRock was negligent in performing its obligation which was to obtain and have in place a
proper OEE policy.

50. If Lloyd's denies coverage here to NCPA by asserting that the Control of Well
Policy is not an OEE policy thus potentially eliminating Lloyd's liability under the policy, then
AltaRock was negligent in not obtaining the correct insurance policy.

51. If Lloyd's denies coverage in this matter as a result of AltaRock's negligence in
obtaining the wrong insurance policy, then NCPA will suffer damages as a legal and proximate
cause of AltaRock's negligence.

52. As a result of the negligence of AltaRock as described above, NCPA has been
damaged and/or will be damaged in an amount that is in excess of the jurisdictional minimum of
this Court but which includes the cost for redrilling/replacing Well E-7, properly abandoning Well
E-7 and mitigating the condensable gas issue described above.

Complaint for Negligence and Declaratory Relief    Case No.
1595295                                   9

1                                **PRAYER FOR RELIEF**

2         Wherefore NCPA prays for relief as follows:

3            1.      For all compensatory, incidental, consequential and all other damages legally and

4 proximately caused by AltaRock's actions and/or omissions;

5            2.      For a declaration that AltaRock was negligent and that as a result, NCPA is entitled

6 to receive from Lloyd's of London the full benefits of the policy attached as Exhibit D including

7 all amounts which will fully compensate and make NCPA whole for the damage caused by

8 AltaRock;

9            3.     For compensatory, incidental, consequential and all other damages legally and

10 proximately caused by Lloyd's breach of contract;

11            4.      For all costs of suit and attorneys' fees as permitted either by agreement or by

12 statute;

           5.      For all other and further relief that the Court deems necessary and appropriate.

13 Dated: March 1, 2011           MEYERS, NAVE, RIBACK, SILVER & WILSON

14

15                                 By:_____
                                     Geoffrey Spellberg

16                                     Attorney for Respondent/Cross-Claimant
                                    NORTHERN CALIFORNIA POWER AGENCY

17

18                                  **JURY DEMAND**

19         Plaintiff NCPA hereby demands a jury trial in this action.

20 Dated: March 1, 2011           MEYERS, NAVE, RIBACK, SILVER & WILSON

21

22                                 By:_____
                                     Geoffrey Spellberg

23                                     Attorney for Respondent/Cross-Claimant
                                    NORTHERN CALIFORNIA POWER AGENCY

24

25 1595295.1

26

27

28

Complaint for Negligence and Declaratory Relief               Case No.
1595295                                10

# EXHIBIT A

218141.1

# Demonstration and Development Agreement

## Geysers Geothermal Field

This Demonstration and Development Agreement ("Agreement") is entered into this 20th day of May, 2009 (the "Effective Date"), by and between the Northern California Power Agency ("NCPA"), a joint powers public agency organized and existing under the laws of the State of California, and AltaRock Energy, Inc. ("AltaRock"), a Delaware corporation with offices located 2320 Marinship Way, Sausalito, CA, 94965. NCPA and AltaRock are also referred to individually as a "Party" and collectively as the "Parties."

### 1.0    Background

1.1    NCPA holds various geothermal leases ("Geothermal Leases") in The Geysers Geothermal Field, northeast of Santa Rosa, California ("Geysers"), and currently operates and maintains a number of geothermal producing wells ("Wells") in addition to a steam gathering system ("Gathering System") and a waste water pipeline supplying water for reservoir recharge. The Wells and Gathering System currently supply steam to two (2) NCPA 110 megawatt dry steam power plants.

1.2    AltaRock has experience in well drilling, fracturing and well rework activities to enhance steam production, and AltaRock has filed more than twenty (20) U.S. patents as the inventor with respect to various of its proprietary inventions and techniques related to Enhanced Geothermal Systems ("EGS") and is also the exclusive licensee under certain EGS technology patents filed by others. Additionally, AltaRock has received grants from the Department of Energy to demonstrate and further develop its proprietary EGS technology under grant conditions which expressly preserve the confidential and proprietary nature thereof.

1.3    AltaRock is interested in demonstrating the capabilities of its EGS technology under the terms hereof in which the confidential and proprietary nature of such technology will be preserved and NCPA is interested in enhancing the production capability from its Leases pursuant to the terms of this Agreement.

1.4    If the Project is successful, the Parties intend to attempt to negotiate a mutually satisfactory agreement under which the benefits of AltaRock's proprietary technology might be applied to NCPA's other Wells and lease positions at the Geysers field.

### 2.0    Demonstration Project

2.1    **Project Description.**  The demonstration project will consist of AltaRock testing and demonstrating its proprietary EGS technology below the depth of the normal Geysers reservoir to create deeper EGS reservoir(s) as new and separate production zones of geothermal fluids ("Project").

1

2.2    Project Objectives.  The Project has the following objectives:

(a)    To deepen existing NCPA Well E-7 and to drill up to one (1) new well at the Demonstration Site;

(b)    To create new EGS reservoir(s) associated with such Wells; and

(c)    To test the economic viability of producing commercial quantities of geothermal fluids from the heat source contained in the new EGS reservoir(s).

2.3    Project Location.  NCPA, through its Geothermal Leases, will make available the Well E-7 and a portion of the E-Site well pad as identified in Appendix A as the demonstration site for the Project ("Demonstration Site").

2.4    Project Benefits.  If successful, the Project would be expected to provide the following benefits by utilizing AltaRock's proprietary technology under the terms hereof:

(a)    To enhance the usability of existing NCPA Well E-7; and

(b)    To produce additional quantities of renewable energy through the use of geothermal fluids collected from new EGS reservoir(s) created at the Demonstration Site.

2.5    Project Schedule.  The Project is expected to proceed in two (2) phases, as follows:

(a)    Phase 1:  Drilling, data collection, Seismic analysis, Geothermal Fluid collection and possible Steam sale to NCPA.  Phase 1 shall run for a period of one (1) year from the Effective Date, unless such period is extended by mutual written agreement.

(b)    Phase 2:  Geothermal Fluid collection and Steam sale to NCPA.  Phase 2 shall run for a period of one (1) year from the end of Phase 1, unless such period is shortened or extended by mutual written agreement.

3.0    Phase 1 Scope of Work

3.1    AltaRock Phase 1 Activities.  Beginning on the Effective Date, AltaRock shall:

(a)    Complete the installation of an eight station seismic monitoring array and processing system ("Seismic Array") and to timely make the processed data, that describe the location and USGS-equivalent magnitude of each event measured remotely available to the Parties on a real-time basis.

(b)    Deepen existing NCPA Well E-7 to a depth of at least one thousand (1,000) feet below the top of the basalts.

2

(c)     Case off the currently existing Geysers reservoir interval to a depth of no less than one thousand (1,000) feet below the top of the felsite with a cemented liner.

(d)     Further deepen Well E-7 toward a planned depth of approximately twelve thousand (12,000) feet.

(e)     Create new EGS reservoir(s) in a manner to avoid any fluid transfer between the new EGS reservoir(s) and the existing Geysers reservoir, followed by well testing and evaluation.

(f)     Drill up to one (1) new well into the newly created EGS reservoir(s) at the Demonstration Site; and

(g)     Install a steam separator and monitor and analyze the steam production to help determine if commercial quantities of Quality Steam (as defined below) and hot water are capable of being produced from the new EGS reservoir(s).

3.2     **NCPA Phase 1 Activities.** Beginning on the Effective Date, NCPA shall:

(a)     Provide access to the Demonstration Site, the Well E-7 and the portion of the E-Site well pad as identified in **Appendix A**;

(b)     Make available to AltaRock temporary use of appropriate office space & facilities to support its Project staff;

(c)     Provide water for injection from the SE Geysers Effluent Pipeline ("SEGEP") to the Demonstration Site as reasonably needed by the Project to the extent available to NCPA, and at the cost set forth in Section 6.1(g)(2) below;

(d)     Provide 2/kw electric power to the Demonstration Site, as reasonably needed by the Project, to the extent available to NCPA, for the price set forth in Section 6.1(g)(1) below;

(e)     Provide access to NCPA's existing steam gathering system (at existing gathering pressure), in order for AltaRock to deliver all steam produced from the Project;

(f)     Provide AltaRock with access to NCPA's well and seismicity data which is relevant to the Project; and

(g)     NCPA acting as the operator of the wells at the Demonstration Site, shall provide AltaRock with all reasonable permitting assistance, including participating in any public meetings.

3.3     **Phase 1 Review.** If AltaRock and NCPA each perform their respective Phase 1 activities and, at the end of the Phase 1 period, if AltaRock and NCPA each determine in

their respective reasonable judgment that the Performance Criteria described in Section
7 below can still be achieved, then Phase 1 shall be deemed complete and the Project
shall proceed to Phase 2 pursuant to the terms of this Agreement. If, however,
AltaRock or NCPA determines, in its own reasonable judgment, that the Performance
Criteria cannot be achieved, then either AltaRock or NCPA may terminate the Project
(and this Agreement) early pursuant to Section 9.2 below.

**4.0   Phase 2 Scope of Work**

**4.1   AltaRock Phase 2 Activities.**  Deliver and sell Quality Steam into NCPA's steam
Gathering System pursuant to the terms set forth in Appendices B and C.

**4.2   NCPA Phase 2 Activities** (in addition to continuing its Phase 1 activities specified
in Section 3.2 above):

   (a)   Make its steam Gathering System available to accept Quality Steam from
the Demonstration Project; and

   (b)   Accept Quality Steam from AltaRock pursuant to the terms set forth in
Appendices B and C.

**5.0   Project Advisory Committee**

**5.1**   As of the Effective Date, the Parties shall monitor the development of the Project
as follows:

   (a)   The Parties shall establish a Project Advisory Committee ("PAC") which
shall consist of four (4) members: two (2) employees from AltaRock, and
two (2) employees from NCPA.  Each Party shall nominate its own
representatives within thirty (30) days of the Effective Date.

   (b)   All PAC meetings shall be held at NCPA's Geothermal Project #1 offices
in The Geysers in California.  NCPA shall appoint a secretary which duties
shall include, among others, drafting meeting agendas and recording
meeting minutes.  All agendas and meeting minutes shall be subject to
mutual agreement of the four (4) PAC members.

   (c)   The PAC shall meet every two (2) weeks on Wednesday beginning at
10:00 am (or such other day(s) and time(s) as the Parties may agree in
writing).

   (d)   Either Party may invite guests or consultants to participate in the meetings
by providing at least forty-eight (48) hours prior notice to the other Party
and provided that (i) any such third party guest or consultant has signed
and delivered a confidentiality agreement in favor of AltaRock or NCPA,
as applicable, in customary form, and (ii) does not constitute an AltaRock
competitor, as determined in AltaRock's reasonable judgment.  For the

4

avoidance of doubt, either Party may invite its own employees to the meeting without providing prior notice to the other Party.

5.2     The PAC's scope of involvement in the Project shall be limited to the following activities:

    (a)   Reviewing and commenting on the EGS reservoir development plan for the Project provided by AltaRock ("Reservoir Development Plan");

    (b)   Reviewing and commenting on an annual Project budget provided by AltaRock ("Project Budget");

    (c)   Reviewing the status of the Project, including its potential to achieve the Performance Criteria;

    (d)   Reviewing the seismic activity data produced from the Array;

    (e)   Reviewing and submitting all proposed amendments to this Agreement to the Parties for consideration and approval by their respective management; and

    (f)   Performing such other functions and duties that are expressly assigned to it by the Parties in this Agreement.

5.3     Maintenance of Records and Documents. All actions, resolutions, determinations and reports made or utilized by the PAC as required by this Agreement shall be recorded in the meeting minutes. A quorum for any meeting shall be all four (4) PAC members, and all PAC actions and resolutions shall require the affirmative vote of all four (4) PAC members.

6.0     Cost Allocation and Payment Procedure

6.1     As of the Effective Date, costs and expenses of the Parties shall be paid as follows:

    (a)   Each Party shall pay its own costs for its management staff dedicated to the Project (including its own PAC representatives). If NCPA non-management employees are requested by AltaRock to provide advisory (consulting) services, and those employees are available for such work, then a Work Request and Report form is to be filled out and approved by an authorized representative of each Party. The hourly labor charge for such NCPA employees is to be the same as then currently charged by NCPA to other third parties (e.g. Calpine), and the hours of work by employees are to be documented in a monthly Work Order report. In addition, any Demonstration Project related third party costs incurred by NCPA are to be reimbursed by AltaRock.

    (b)   At a cost of one hundred dollars ($100) per year, NCPA will provide

5

access to the Demonstration Site, the Well E-7 and that portion of the E-
Site well pad identified in _Appendix A_, and the related Gathering System,
and provide temporary use of appropriate office space & facilities to
AltaRock's Project staff. AltaRock shall provide for its own separate
communication facilities.

(1) NCPA will provide hydroelectric power to the Demonstration Site for
the same price that NCPA pays for geothermal renewable power
which is Ninety Eight Dollars ($98.00) per MWhr.

(2) The cost of the volume of SEGEP water delivered by NCPA to
AltaRock at the Demonstration Site in any month shall be equal to
its proportional share of the total electricity costs to transport and
deliver the total volume of SEGEP water to The Geysers that
month.

(c) Within 15 days after the end of each month that Project costs, as
described above in Section 6.1, have been incurred by NCPA, NCPA shall
prepare and submit to AltaRock an invoice that includes (1) all billings to
the Project for any non-management NCPA employee labor provided to
the Project during that previous month, (2) reimbursement of any third-
party costs related to the Project, (3) all charges for 21kv power delivered
to the Project, and (4) all charges for SEGEP water delivered to the
Project during that previous month. Such monthly invoice is to be paid to
NCPA by AltaRock within 30 days from the invoice date. If the Agency
does not receive payment within 30 days interest will begin to accrue on
the 31st day at a rate of one-percent per month until paid.

(d) AltaRock shall waive all AltaRock EGS technology license fees while it is
drilling, developing and demonstrating the EGS technology at the Test
Well(s) hereunder. In addition, AltaRock shall pay for all Well modeling &
monitoring equipment costs, shall fund Well rework, and any well drilling
costs, and all costs associated with AltaRock engineering and
producing incremental capacity at the Demonstration Site as set forth in
the Reservoir Development Plan, including but not limited to incremental
permitting costs associated with the rework and/or deepening of the Wells.

(e) Within 60 days following the Effective Date of this Agreement, AltaRock
shall deposit Ten Thousand Dollars ($10,000) in the Anderson Springs
Homeowners Association, Inc. bank account for use by that community for
geothermal impact mitigation purposes. Thereafter, AltaRock is to deposit
an equal dollar amount within 30 days of each subsequent anniversary of
the Effective Date, for as long as AltaRock continues to conduct
operations within the area of NCPA Leasehold CA-949.

6.2 All other Project costs identified in the Project Budget (including any revisions
thereto) are to be funded by AltaRock unless otherwise mutually agreed.

6

## 7.0   Project Evaluation

7.1     The Parties agree that evaluation of the Project's success will be an ongoing endeavor throughout the term of this Agreement.  Such ongoing evaluation will be undertaken by NCPA and AltaRock together, acting in good faith, and shall include the following criteria ("Performance Criteria"):

(a)     Development of Separate EGS Reservoirs.   The EGS reservoir(s) developed by AltaRock at the Demonstration Site must be completed exclusively within the felsite at sufficient depth to completely eliminate any fluid transfer between the EGS reservoir(s) and the normal Geysers reservoir currently being utilized by NCPA in the area of the Demonstration Site.

Verification of the above conditions shall be provided by an independent consultant selected by mutual agreement of the Parties and the costs for this independent consultant's report shall be shared equally by the Parties. The independent consultant performing such task shall be required to sign a confidentiality agreement in favor of NCPA and AltaRock, and shall not be an AltaRock competitor, as reasonably determined by AltaRock. Furthermore, if such verification is obtained but either Party subsequently has substantive reason to believe that the separation conditions have not been maintained, re-verification of the separation conditions shall be required.

(b)     Commercial Viability of the Project.   If the EGS reservoir(s) are successfully developed in a manner to satisfy the separation conditions described in Section 7.1(a) above, then the new EGS reservoir(s) must be tested to determine if they are capable of long-term commercial development. This will entail a review of both the quality and quantity of the geothermal fluids produced from the Project, including a determination if the projected long-term makeup water requirements are acceptable to both parties.

Verification of the above conditions shall be provided by an independent consultant selected by mutual agreement of the Parties and the costs for this independent consultant's report shall be shared equally by the Parties. The independent consultant performing such task shall be required to sign a confidentiality agreement in favor of NCPA and AltaRock, and shall not be an AltaRock competitor, as reasonably determined by AltaRock.

(c)     Preparation for Commercial Development.   Upon the successful verification that the Project is capable of commercial development and that the EGS reservoir(s) would continuously satisfy the separation conditions described in Section 7.1(a) above, NCPA shall grant to AltaRock a right to negotiate a bona fide agreement related to the Demonstration Site and the balance of NCPA's geothermal lease position at the Geysers. If AltaRock is agreeable, NCPA and AltaRock shall develop a separate Steam Sale and Purchase Agreement that will establish terms and conditions pursuant

to which the parties shall transact business over a long period. It is understood that such an agreement may require approval by the BLM. The parties will attempt in good faith to negotiate such a long term agreement for a period of twelve (12) months following the commercial development verification and thereafter will cooperate to seek all relevant approvals therefore for a period of twenty-four (24) months after finalization of the agreement.

7.2 Seismic Activity. The Parties shall continually analyze results from the Seismic Array throughout the Term (as defined below), and the Parties agree that the "AltaRock Induced Seismicity Protocol" included as Appendix F in this Agreement is to be followed during the full term of this Agreement. If the Project induces seismic events that are of sufficient magnitudes and/or frequencies to cause damage and/or raise community concerns which cannot be reasonably mitigated by either Party, then either Party has the right, in its reasonable discretion, to suspend the activities at the Project which are including such events for up to three (3) months in order for the Parties to mutually evaluate the situation and propose alternative procedures for testing and evaluation. If reasonable alternative procedures are not available or are not effective upon implementation (such effectiveness to be determined no later than six (6) months after implementation), then either Party may thereafter terminate the Project (and this Agreement) early pursuant to Section 9.2 below.

8.0 Exclusivity.

8.1 The Parties agrees to pursue the development of the Project exclusively with each other at NCPA geothermal lease position at the Geysers in accordance with the terms of this Agreement, including any revisions and/or amendments hereto. The Parties shall be entitled to specifically enforce the provisions of this Agreement relating to exclusivity.

8.2 The Parties agree that this Agreement shall not limit the activities of each other outside NCPA's geothermal lease position at the Geysers, provided that there is strict compliance with the provisions hereof which protect the confidentiality and non-exclusive licensing of AltaRock's proprietary EGS technology and techniques, as specified herein.

9.0 Term & Termination.

9.1 Term. The term of this Agreement shall commence as of the Effective Date and shall remain in full force and effect until two (2) years from the Effective Date, unless otherwise terminated earlier pursuant to this Agreement or extended by written agreement of the Parties (the "Term").

9.2 Early termination. The Parties acknowledge and agree that certain provisions of this Agreement provide for early termination (i.e., termination of this Agreement prior to the end of the Term). If a Party invokes its right to terminate this Agreement early, the terminating Party shall provide at least thirty (30) days prior written notice to the other Party, and shall explain in detail its rationale for such early termination. Any dispute

over a Party's ability to terminate this Agreement early shall be resolved pursuant to Article 15 below.

9.3  Transfer of Ownership and Restoration.  If the Project is terminated without achieving "commercial development", then the use of the Well(s) drilled by AltaRock will be transferred to NCPA and the use of Well B-7 will be returned to NCPA, subject to the terms of the nonexclusive license agreement referred to in Section 16.2 below, which shall survive the termination of this Agreement.  For the avoidance of doubt, NCPA will not obtain ownership of any AltaRock proprietary EGS technology under this Agreement, but only the right to use it pursuant to the terms hereof and such non-exclusive license agreement, which shall survive the termination of this Agreement for any reason.

9.4  For the avoidance of doubt, AltaRock shall not obtain ownership of any Wells under this Agreement, but only the right to use them pursuant to the terms hereof.  In addition, after such termination, if NCPA reasonably determines that any of the wells drilled or deepened by AltaRock are of no future use to NCPA, including for use as injection Wells, (and NCPA agrees that it will use all reasonable commercial efforts to utilize such Wells as Injection Wells), then AltaRock shall (a) properly abandon each such well which cannot be used as an injector in the manner prescribed by BLM, and (b) restore that portion of E-Site well pad used by the Project to the condition it was in prior to the beginning of the Project.

9.5  Following termination of this Agreement, NCPA shall have the option, exercised by written notice within thirty (30) days of the Termination Date, to acquire all or part of the any equipment that has been installed around the Demonstration Site by AltaRock for a price equal to AltaRock's out of pocket cost of acquiring such equipment (exclusive of installation) less ten percent (10%); provided that NCPA shall agree to become solely responsible for any reclamation costs and obligations associated with the bore holes located where the particular any equipment that NCPA chooses to purchase.

## 10.0  Confidentiality.

10.1  The Parties recognize that, in connection with entering into this Agreement, they will be exchanging non-public, proprietary and confidential information in oral, written or electronic form ("Confidential Information"), the disclosures of which would be detrimental to the Project or the Party providing such information.  Confidential Information hereunder shall not include: (a) information that is or becomes generally available to the public, other than by breach of this Agreement by a Party or its agents or representatives (as defined below) or (b) information that a Party can demonstrate was in its possession as the time of disclosure and was not acquired by it directly or indirectly from the other Party on a confidential basis.

10.2  Each Party shall treat all Confidential Information relating to the Project as confidential and shall not disclose such Confidential Information to any third party during the term of this Agreement and following the expiration or termination hereof.  Further, each Party agrees to use the Confidential Information of the other Party solely for the purposes of pursuing the Project.

9

10.3   Notwithstanding the foregoing, each Party may disclose any Confidential Information to: (a) its directors, officers, employees, agents, advisors or representatives of a Party who need to know such Confidential Information for the purpose of working on the Project; and (b) third parties in connection with providing financing, construction services, equipment or other Project-related items and to such entities' respective directors, officers, employees, agents, advisors or representatives who need to know such Confidential Information for the purpose of providing such equipment, services or financing (collectively, "Representatives").   Each Party agrees that all Representatives provided with Confidential Information shall be informed of the confidential nature of such information and the obligation for them to comply with the confidentiality and non-use obligations hereunder, and each Party agrees to be responsible for any breach by its Representatives of the terms hereof.

10.4   If any Party shall become legally compelled by any court or governmental authority to disclose any Confidential Information, then such Party shall give the other Party prompt written notice of any such required disclosure, so that the other Party may seek a protective order or other appropriate remedy provided, however, that in the event such protective order or other remedy is not obtained, the receiving Party shall furnish only that portion of the Confidential Information that it is legally required to provide.

10.5   Upon the Termination Date, each Party shall use reasonable efforts to promptly destroy or return to the other Party all Confidential Information obtained from such other Party in physical or electronic form, including destroying all summaries, notes and similar materials which describe or incorporate or reflect the Confidential Information.

## 11.0   Compliance with Governmental Regulations; Conduct of Operations

11.1   AltaRock and its subcontractors shall comply with all laws, permits, orders, ordinances, regulations and statutes of federal, state and local governmental agencies and authorities ("Governmental Regulations"), plus NCPA's Safety Procedures, applicable to AltaRock's performance under this Agreement.

11.2   In performing its scope of work hereunder at the Demonstration Site, AltaRock and its subcontractors shall also comply with all of the requirements contained in U.S. Geothermal Lease CA-949, a copy of which is attached hereto as Appendix D, but only to the extent that such requirements relate solely to the Project and are incidental to existing NCPA obligations. For the avoidance of doubt, AltaRock shall not be responsible for any obligations, liabilities or requirements, including environmental responsibilities that relate to the prior activities of NCPA or its agents at the Demonstration Site.

11.3   AltaRock shall not alter or modify any NCPA equipment, Wells, roads, lands, etc. ("NCPA Property") without NCPA's prior written approval.

11.4   Prior to commencing any work pursuant to this Agreement, AltaRock shall submit to NCPA a list of all employees and contractors that are assigned to meet NCPA Guard

10

Gate clearance for access to the Demonstration Site. Thereafter, AltaRock shall revise the list as necessary and resubmit it to NCPA for approval. Requests for Guard Gate clearance for anyone not included on the then currently approved list are to be submitted to NCPA at least twenty-four (24) hours in advance for approval, unless an emergency condition requires more immediate attention. NCPA may refuse or revoke Guard Gate access if it is believed to be necessary for reasons of safety or security.

11.5   AltaRock shall provide to NCPA personnel complete and unrestricted access to all drilling activities, including the logging trailer, geologist, company man and all drilling records. Further, AltaRock shall provide to NCPA a copy of the morning report for each day of drill activity at the Demonstration Site.

11.6.   All records regarding the handling and hauling of drilling waste and drill cuttings shall be made available to NCPA upon request, and all disposed wastes must have proper identification manifests.

11.7   NCPA has the right to stop any AltaRock activity that interferes with or endangers NCPA Property, personnel and/or operations.

12.0   Insurance Requirements.

12.1   Prior to commencing any work at the Demonstration Site pursuant to the terms of this Agreement, AltaRock shall, at its own cost and expense, procure the types and amounts of insurance listed below, and shall maintain such policies for the entire Term of this Agreement.

   (a)   Workers' Compensation. If AltaRock employs any person, AltaRock shall maintain Statutory Workers' Compensation Insurance and Employer's Liability Insurance for any and all persons employed directly or indirectly by AltaRock with limits of not less than One Million Dollars ($1,000,000.00) per accident.

   (b)   Commercial General and Automobile Liability Insurance. AltaRock shall maintain commercial general and automobile liability insurance for the term of this Agreement in an amount not less than One Million Dollars ($1,000,000.00) per occurrence, combined single limit coverage for risks associated with the work undertaken by this Agreement. Such coverage shall include, but shall not be limited to, protection against claims arising from bodily and personal injury, including death resulting therefrom, and damage to property resulting from activities contemplated under this Agreement, including the use of owned and non-owned automobiles. The Agency shall be named as an additional insured and insurance shall provide primary coverage with respect to the Agency by written endorsement to the policy.

   (c)   General Liability/Umbrella Insurance. The coverage amounts set forth above are to be supplemented by an umbrella general liability policy for the term of this Agreement in an amount of not less than Five Million

11

Dollars ($5,000,000) to be used as necessary, including payment of damages resulting from seismic activities associated with the Project.

(d) **Operators Extra Expense Policy.** AltaRock shall maintain Operators Extra Expense (OEE) policy in the amount of Ten Million Dollars ($10,000,000) to cover additional expenses for AltaRock incurred in connection with well-drilling activities contemplated under this Agreement. NCPA shall be named as loss payee on this OEE policy.

12.2   **Verification of coverage.** Prior to commencing any work at the Demonstration Site pursuant to this Agreement, AltaRock shall furnish NCPA with satisfactory evidence of coverage, including copies of all policies and all endorsements required by Section 12.1 of this Agreement.

12.3   **No Reduction in or Cancellation of Coverage.** An endorsement must be attached to all AltaRock insurance policies obtained in accordance with Section 12.1 of this Agreement stating that coverage shall not be suspended, voided, canceled by either Party, or reduced in coverage or in limits, during the Term. If AltaRock fails to maintain such required AltaRock insurance policies at the required amounts throughout the Term, then NCPA may either procure additional insurance on AltaRock's behalf, and bill AltaRock for the costs thereof, or terminate this Agreement early pursuant to Section 8.3 above. AltaRock shall cease all drilling activity on the Demonstration Project until such time that it is able to furnish and maintain the AltaRock insurance coverage required by Section 12.1 of this Agreement.

12.4   **Subcontractors.** AltaRock shall require Nabors Drilling USA, L.P. and those other of its subcontractors performing drilling services at the Demonstration Site to procure and maintain customary general liability, automobile and worker's compensation insurance with carriers in amounts and having terms as is customarily reasonable given the scope of the services being provided. Such subcontractor insurance coverage shall be maintained by any such subcontractor for the duration that they provide services to AltaRock on NCPA Property and shall include NCPA as additional insured. AltaRock shall also provide NCPA with satisfactory evidence of any such subcontractor's insurance coverage.

## 13.0   Indemnification.

13.1   Each Party shall indemnify, defend and hold harmless the other Party and its officials, commissioners, officers, directors, employees and agents from and against any and all losses, liability, claims, suits, actions, damages, and causes of action arising out of any personal injury, bodily injury, loss of life, or damage to property, or any violation of any Governmental Regulation, to the extent caused, in whole or in part, by the willful misconduct or negligent acts or omissions of the indemnifying Party or its employees, subcontractors, or agents, by acts for which they could be held strictly liable, or by the negligent design or character of their work. The foregoing obligation of each Party shall not apply to the extent (a) the injury, loss of life, damage to property, or violation of Governmental Regulation arises, from the negligence or willful misconduct of the other Party or its officers, employees, or agents; and (b) the actions of the other Party or its

12

employees, subcontractor, or agents have contributed to the injury, loss of life, damage to property, or violation of law.

13.2 Acceptance by NCPA of insurance certificates and endorsements required under this Agreement shall not relieve AltaRock from any indemnification liability under this Agreement. The indemnification obligations contained herein shall apply to any and all damages or claims for damages whether or not any insurance policies shall have been determined to apply.

14.0 Law & Venue.

14.1 This Agreement has been executed and delivered in the State of California, and the validity, enforceability and interpretation of any of the provisions of this Agreement shall be determined and governed by the laws of the State of California, without regard to the doctrine of law doctrine.

14.2 The duties and obligations of the parties created hereunder are performable in Placer County and in that County where the Project is located. Either Placer County or the County where the Project is located shall be the venue for any action or proceeding that may be brought or arise out of, in connection with or by reason of this Agreement.

15.0 Dispute Resolution.

15.1 In the event that either Party has a dispute or deadlock arising under this Agreement which is not promptly resolved by the PAC, such dispute or deadlock shall be referred directly to a senior executive (who is not a member of the PAC) of each Party who will be jointly be authorized to resolve any dispute or issue arising under this Agreement in an equitable manner.

15.2 The two designated senior executives shall meet, in person or by telephone, within fifteen (15) days after the date of such dispute or issue was submitted to them and shall attempt to resolve all disputes and issues arising hereunder promptly, equitably, and in good faith.

15.3 If the designated senior executives are unable to resolve the dispute within fifteen (15) days after the date on which they commenced their attempt to resolve the dispute, then either Party may refer such dispute to the American Arbitration Association ("AAA"), which shall appoint one arbitrator experienced in geothermal production to resolve the dispute through binding arbitration under the AAA commercial arbitration rules.

15.4 Judgment on an award rendered by the arbitrator hereunder may be entered in any court having jurisdiction.

16.0 Other Provisions.

16.1 Assignment. Except for assignments to wholly owned affiliates, or collateral assignments by a Party solely for financing purposes which do not release such Party

13

from its obligations hereunder; a Party may not assign, subcontract or delegate any of its rights or obligations hereunder to any other person or entity without the prior written consent of the other Party, which consent may be withheld in the other Party's sole discretion.

16.2   Non-exclusive License.   As of the Effective Date, AltaRock hereby grants NCPA and the Project the right to use, on a nonexclusive basis, for no compensation, the AltaRock EGS technology being installed and used at the Project pursuant to the terms of AltaRock's standard EGS license agreement.

16.3   Consequential Damages Excluded.   Notwithstanding anything to the contrary elsewhere herein, neither Party shall be liable, whether by way of indemnity or a result of a breach of this Agreement or otherwise, for any indirect, incidental, exemplary, special, punitive or consequential damages, including without limitation, loss of revenue, cost of capital, loss of business reputation, or opportunity and costs due to delays in payment, whether any such damages arise out of contract, tort (including negligence), strict liability or otherwise.

16.4   Licenses and Permits.   AltaRock represents and warrants to NCPA that AltaRock and its subcontractors have all licenses, permits, qualifications and approvals which are legally required to practice their respective professions.   AltaRock agrees to provide written verification of this representation and warranty to NCPA upon written request.

16.5   Escrow Agreement.   In lieu of faithful performance and payments bonds, within five (5) business days of the Effective Date, AltaRock shall provide NCPA with an executed Escrow Agreement in the form and for the amount set forth in Appendix E ("Escrow Agreement").   The Escrow Agreement shall be in force and effect until the Demonstration Project is terminated.

16.6   Nondiscrimination and Equal Opportunity.   In compliance with federal, state and local laws, AltaRock shall not discriminate, on the basis of a person's race, religion, color, national origin, age, physical or mental handicap or disability, medical condition, marital status, sex, or sexual orientation, against any employee, applicant for employment, subcontractor, owner by a subcontractor, or participant in, recipient of, or applicant for any services or programs provided by AltaRock under this Agreement.

16.7   Relationship of the Parties.   This Agreement shall not be construed as creating any fiduciary or agency relationship of any nature between the Parties.   Each Party is, in all of its capacities hereunder, acting under this Agreement as an independent contractor.   Nothing contained in this Agreement shall be construed as creating or requiring any continuing relationship or commitment between the Parties other than is specifically provided herein.   No Party shall be responsible hereunder for the acts or omissions of the other Party.

16.8   Notices.   All notices to be given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given upon delivery: (a) if delivered in person; (b) on the second (2nd) business day if delivered by registered first class mail, return receipt requested; or (c) on the first (1st) business day after sending by reputable

14

overnight delivery service, to the addresses set forth below or to such other address as any Party may give notice of to the other Party:

If to NCPA:

James H. Pope
General Manager
Northern California Power Agency
651 Commerce Drive
Roseville, CA 95678

With a copy to:

Michael C. Dean
General Counsel
Meyers Nave
555 Capitol Mall, Suite 1200
Sacramento, CA 95814

If to AltaRock:

Adrian Foley
Vice President, Business Development
AltaRock Energy, Inc.
2320 Marinship Way, Suite 300
Sausalito, CA 94965

With a copy to:

Steven McArthur
Vice President & General Counsel
AltaRock Energy, Inc.
2320 Marinship Way, Suite 300
Sausalito, CA 94965

16.9  **Press Releases.** Any press release, publication and/or public communication describing or concerning the Project must be approved by both Parties in writing prior to release.

16.10  **Amendments.** No amendment, modification or waiver of this Agreement shall be valid or binding upon the Parties unless such amendment, modification or waiver shall be in writing and duly executed by both Parties.

16.11  **Entire Agreement; Severability.** This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes any and all other prior understandings, correspondence and agreements, oral or written, between or among the Parties. If any part of this Agreement is determined or deemed to be void or unenforceable, the remainder of this Agreement shall not be affected thereby and any void or unenforceable provision shall be replaced by an enforceable provision, which to the greatest extent possible achieves the purpose intended by the Parties.

16.12  **Survival.** The provisions of Articles 9, 10, 13, 14, 15, and 16 shall survive the termination of this Agreement.

* * *

16

IN WITNESS WHEREOF, NCPA and AltaRock have caused this Agreement to be duly executed as of the Effective Date.

NORTHERN CALIFORNIA POWER AGENCY

By _____     Date   5-20-2009
   James H. Pope
   General Manager

ATTEST

By _____     Date   5-20-2009
   Assistant Secretary of the Commission

APPROVED AS TO FORM

By _____     Date   5-19-09
   Benjamin T. Hayes II
   Assistant General Counsel

ALTAROCK ENERGY, INC.

By _____     Date   5-19-09
   Ben O'Shei
   Chief Executive Officer

ATTEST

By _____     Date   5-19-09
   Title:

17

## APPENDIX A

### Demonstration Site



Location of the AltaRock EGS Demonstration Site
within NCPA Lease CA-949
East of 1,798,740 E and South of 396,500 N

## APPENDIX B

### Steam Quality and Quantity

Steam Quality. Any steam produced by AltaRock and delivered to the Gathering System during either Phase 1 or Phase 2 of the Project must be at a steam quality of 100% and at a pressure no less than the Gathering System's local line pressure. Steam which meets or exceeds the above criteria shall be considered "Quality Steam."

Alta Rock shall install measuring devices acceptable to NCPA that will ensure that Quality Steam is produced, and that will measure the quantity of steam delivered by the project to the Gathering System.

## APPENDIX C

### Steam Payments

Provided that the EGS steam delivered by AltaRock hereunder to NCPA is Quality Steam, NCPA shall pay AltaRock for the net energy generated using the EGS steam in the following manner:

1. The metered total of the pounds of Quality Steam delivered each month to NCPA, which will have been transported by the Gathering System to Unit 4 at NCPA's Plant #2, is to be multiplied by the Unit 4 conversion rate that is officially reported in NCPA's Plant Operations Report for that month, adjusted from pounds of steam per Gross KWH generated to pounds of steam per Net KWH generated, in order to calculate the net amount of electricity generated by the steam delivered by AltaRock.

2. NCPA shall pay $91.75/MWH for the net generation calculated in the above manner, to be paid by NCPA within thirty (30) days of the end of each month that steam has been delivered to NCPA by AltaRock.

To the extent any portion of the steam delivered does not constitute Quality Steam but nevertheless is used by NCPA, the Parties will agree on a satisfactory discounted price to reflect the value of the use by NCPA of such steam.

APPENDIX D

U.S. Geothermal Lease CA-949
(See Attached)

UNITED STATES DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

2800 Cottage Way

Sacramento California 95825

Serial Number: CA 950

"A"

## SPECIAL STIPULATIONS AND CONDITIONS

## GEYSERS KGRA

The lessee shall contact the Supervisor prior to the development of a plan of operation to be apprised of practices which shall be followed or avoided in field development, including but not limited to road standards, road crossings, gates, cattleguards, fencing, erosion controls, and surface rehabilitation.

The lessee shall comply with the following special conditions and stipulations unless they are modified by the lessor, the Supervisor, and the authorized officer.

1. Upon notification by the authorized officer that archeological values exist or are believed to exist in the leased lands, the Lessee will engage a qualified archeologist, acceptable to the BLM, to survey and salvage items of archeological value in advance of any surface disturbance. The responsibility and cost of this survey and salvage will be that of the Lessee.

2. The Lessee shall participate in earthquake and land subsidence prevention and detection programs applicable to the leased area where determined to be necessary.

3. Mud pits and sumps containing any additives toxic to wildlife will be protected from entry by birds and other wildlife.

4. Noise levels shall at all times be kept to a minimum and will never exceed 65 decibels at a distance of 1,[illegible] feet from the source.

5. No clearing of ground cover for power transmission lines, except for tower or pole pads, shall be allowed.

6. All power and transmission lines will be designed to minimize loss of raptors and other large birds by electrocution. Nonspecular conductors may be required.

7. The use of wide-tired or balloon-tired vehicles and helicopters may be required in affected areas where necessary to protect the soil and other resources.

8. Disturbance of soils within the leased lands which are susceptible to slides, slumps, excessive settlement, soil creep, and severe erosion shall be avoided wherever possible. If it is not possible for the lessee to avoid these areas, the lessee shall comply with special stabilization and prevention of soil movement practices required by the Supervisor.

All soil disturbances shall be stabilized by mulching and seeding.

STATE OF CALIFORNIA } ss.
COUNTY OF SACRAMENTO }

BOOK 3305 PAGE 838

On this 18th day of October 1977, before me, [illegible], a Notary Public in and for the County and State aforesaid, personally appeared Walter F. Holmes, known to me to be the Chief, Branch of Lands and Minerals Operations, for the Bureau of Land Management, Department of the Interior, known to me to be the person who executed the within instrument on behalf of said Bureau of Land Management and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

[notary seal]

[signature]
Notary Public in and for the County of Sacramento, State of California

My commission expires April 4, 1981.

[illegible] OF DOCUMENT

SHELL OIL COMPANY

2





UNITED STATES DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

2800 Cottage Way

Sacramento, California 95825

BOOK 3305 PAGE 844

Serial Number:

CA 942

"B"

SPECIAL STIPULATIONS AND CONDITIONS

GEYSERS, KCRA

The lessee shall consult the Supervisor prior to the development of a plan of operations to be developed of pressures which shall be followed or modified in field development, including but not limited to road standards, road crossings, gates, cattleguards, fencing, erosion controls, and surface rehabilitation.

The lessee shall comply with the following special conditions and stipulations unless they are modified by the Supervisor, the Supervisor, and the authorized officer.

1. ...

2. ...

3. ...

4. ...

5. ...

6. ...

7. ...

8. ...

END OF DOCUMENT

6







9

STATE OF CALIFORNIA } SS.
COUNTY OF SACRAMENTO

BOOK 3305 PAGE 842

10

BOOK 3305 PAGE 843

"A"

## APPENDIX E

Escrow Agreement
(See Attached)

## ESCROW AGREEMENT

This Escrow Agreement dated this [__] day of May, 2009 (the "Escrow Agreement"), is entered into by and among AltaRock Energy, Inc. ("AltaRock"), Northern California Power Agency ("NCPA") (AltaRock and NCPA, collectively, the "Parties," and individually, a "Party"), and Wells Fargo Bank, National Association, as escrow agent ("Escrow Agent").

## RECITALS

A.    In lieu of a payment bond required pursuant to California Civil Code Section 3247, et. seq., the Parties require Escrow Agent to hold the funds identified below in escrow and to disburse them as provided. Rather so as to provide NCPA with assurances that vendors, subcontractors, and suppliers engaged by AltaRock and/or its agents or consultants to perform services at the AltaRock demonstration site located on NCPA's leased geothermal property in Lake County, CA will be fully paid, and to compensate NCPA for any damages caused by drilling of wells E-7 and E-8 that are not otherwise covered by insurance maintained by AltaRock.

B.    It is also expressly agreed that this Escrow Agreement is given to secure the payment by AltaRock of all just claims for equipment, material and supplies used or consumed in the performance of the work in connection with AltaRock's demonstration project ("Project") as set forth in that certain Demonstration and Development Agreement dated May [__], 2009 ("Development Agreement"), entered into by and between the Parties for the payment of all laborers and mechanics for all labor performed in the work therein the Development Agreement, and for the payment of all supplies and subcontractors in conformity with the provisions of the executed documents between the parties.

C.    In addition, it is expressly agreed that this Escrow Agreement is established to ensure that AltaRock maintains an adequate reserve during the course of its activities in drilling Wells E-7 and E-8 so NCPA properly has identified funds set for a specified period of time thereafter for the payment of (i) any claims by NCPA for property damage resulting from drilling of Wells E-7 and E-8 that are not otherwise covered by insurance maintained by AltaRock, or (ii) any claims by third parties for property damage or other liability resulting from indirect activity that is determined by the Parties to have been specifically caused by AltaRock's activities in drilling Wells E-7 and E-8.

D.    AltaRock agrees to place in escrow certain funds and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement.

In consideration of the promises and agreements of the Parties and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties and the Escrow Agent agree as follows:

1

## ARTICLE 1
### ESCROW DEPOSIT

**Section 1.1.** **Receipt of Escrow Property.** Upon execution hereof, AltaRock shall deliver to the Escrow Agent the amount of Five Million Dollars ($5,000,000) (the "Escrow Property") in immediately available funds.

**Section 1.2.** **Investments.**

(a) The Escrow Agent is authorized and directed to deposit, transfer, hold and invest the Escrow Property and any investment income thereon as set forth in Exhibit A hereto, or as set forth in any subsequent written instruction signed by the Parties. Any investment earnings and income on the Escrow Property shall not become part of the Escrow Property and shall be disbursed to AltaRock, as directed in writing by AltaRock.

(b) The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement. The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement. The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account. The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

**Section 1.3.** **Disbursements.** Disbursements of the funds held in escrow shall be made as follows:

(a) After the date that AltaRock certifies in writing to NCPA that (i) the drilling of wells E-7 and E-8 is complete and Newco Drilling, and all other subcontractors, vendors, machinists and material suppliers who have been engaged by AltaRock to perform drilling work on the site at Well E-7 and E-8 have been fully paid therefor, as evidenced by delivery of an Unconditional Waiver and Release Upon Final Payment in substantially the form required by Cal. Civil Code Section 3262, attached hereto and incorporated as Exhibit D ("Lien Releases") to AltaRock, and (ii) if applicable, any claim made by NCPA to AltaRock for property damage related to drilling of Wells E-7 and E-8 is covered by insurance maintained by AltaRock, and if by the fourth (4th) business day of receipt of such certifications and copies of Lien Releases, NCPA does not dispute in writing either such certification, then AltaRock shall direct the Escrow Agent to disburse to AltaRock all funds then held hereunder in excess of Five Hundred Thousand Dollars ($500,000) by submitting to the Escrow Agent a copy of such certifications and Lien Releases together with a written direction by AltaRock to make such disbursement, and shall copy NCPA on such direction.

(b) Notwithstanding the foregoing Section 1.3(a), if NCPA or AltaRock is served with a Stop Notice or Mechanics Lien anytime prior to the termination of the AltaRock

2

demonstration project, then AltaRock or NCPA, as applicable, shall promptly provide a copy of such Stop Notice or Mechanics Lien to the other party; and, if such Stop Notice or Mechanics Lien is not removed to NCPA's satisfaction within five business days thereafter, NCPA shall direct escrow agent to withhold any disbursements of funds to AltaRock in an amount equal to the Stop Notice(s) or Mechanics Lien(s), plus an additional ten percent (10%). Upon receipt of Lien Releases to NCPA and AltaRock of any outstanding Stop Notice(s) or Mechanics Lien(s), NCPA shall direct the Escrow Agent to disburse the amounts withheld by submitting to the Escrow Agent a copy of the Lien Releases together with written direction to make such disbursement and shall copy AltaRock on such direction.

(c)     After the disbursement referred to in subsection (b) above, a balance of five-hundred thousand dollars ($500,000) shall continue to be held in escrow hereunder to ensure that AltaRock maintains an adequate cash reserve (fund released pursuant to subsection (d) below) against any third party claims for property damage or other liability resulting from induced seismicity that is determined by a final court judgment to have been specifically caused by AltaRock's activities in drilling wells B-7 and B-8.

(d)     Ninety (90) days after the date that the Parties' agreement related to AltaRock's demonstration project on NCPA property has terminated, (or ninety days after the last drilling activity conducted by AltaRock, whichever is later,) the Parties shall provide the Escrow Agent with joint written instructions to disburse the balance then remaining in escrow hereunder to AltaRock provided that: (i) no third party claims referred to in subsection (c) are then outstanding or (ii) if such claims are outstanding, AltaRock provides NCPA with an opinion of its outside counsel explaining that AltaRock has meritorious defenses to such claims and is expected to prevail at trial based on such defenses, or that, regardless of the merits of AltaRock's defenses to any such claim, that AltaRock's insurance policies provide coverage for any such claim. If such opinion of outside counsel is not provided by AltaRock, but the amount of any such claims are less than the balance held in escrow, then the parties shall provide joint written instructions to the escrow agent to disburse to AltaRock the amount in excess of all such claim amounts, plus an additional ten percent (10%).

## Section 1.4.   Income Tax Allocation and Reporting

(a)     The Parties agree that, for tax reporting purposes, all interest and other income from investment of the Escrow Property shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by AltaRock, whether or not such income was disbursed during a such calendar year.

(b)     Prior to closing, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request. The Parties understand that if such tax reporting documentation is not provided and satisfied to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the Regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

3

(c)    To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property. The Parties, jointly and severally, shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent. The indemnification provided by this Section 1.4(c) is in addition to the indemnification provided in Section 3.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 1.5.    Termination.

Upon the joint written direction of the Parties or upon other disbursement of all of the Escrow Property, including any interest and investment earnings thereon, this Escrow Agreement shall terminate and be of no further force and effect except that the provisions of Sections 1.4(b), 3.1 and 3.2 hereof shall survive termination.

ARTICLE 2
DUTIES OF THE ESCROW AGENT

Section 2.1.    Scope of Responsibility.    Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature. Under no circumstances will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement. The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original, or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document. References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto. This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

Section 2.2.    Attorneys and Agents.    The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by the Escrow Agent. The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals. The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

4

Section 2.3. Reliance. The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors, or assigns. The Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper parties or persons, without further inquiry into the person's or persons' authority. Concurrent with the execution of this Escrow Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit B-1 and Exhibit B-2 to this Escrow Agreement.

Section 2.4. Right Not Duty Undertaken. The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

Section 2.5. No Financial Obligation. No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

## ARTICLE 3
### PROVISIONS CONCERNING THE ESCROW AGENT

Section 3.1. Indemnification. The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been directly caused by the willful misconduct or gross negligence of the Escrow Agent. The provisions of this Section 3.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 3.2. Limitation of Liability. THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

Section 3.3. Resignation or Removal. The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which it is entitled through the date of termination. Such resignation or

5

removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order. If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

Section 3.4.    Compensation.    The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as Exhibit G, which compensation shall be paid by AlphaRock.    The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. If any amount due to the Escrow Agent hereunder is not paid within thirty (30) days of the date due, the Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.   The Escrow Agent shall have, and is hereby granted, a prior lien upon the Escrow Property with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Escrow Property.

Section 3.5.    Disagreements.    If any conflict, disagreement or dispute arises between, among, or involving any of the Parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent is authorized to retain the Escrow Property until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Property; (ii) receives a written agreement executed by each of the Parties involved in such disagreement or dispute directing delivery of the Escrow Property, in which event the Escrow Agent shall be authorized to disburse the Escrow Property in accordance with such final court order, arbitration decision, or agreement; or (iii) files an interpleader action within its sole court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Property and shall be entitled to recover attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. The Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

Section 3.6.   Merger or Consolidation.   Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, in any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as the predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 3.7.   Attachment of Escrow Property; Compliance with Legal Orders.   In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond to it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

## ARTICLE 4
## MISCELLANEOUS

Section 4.1.   Successors and Assigns.   This Escrow Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns. No other person shall have any rights under this Escrow Agreement. No assignment of the interest of any of the Parties shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld).

Section 4.2.   Escheat.   The Parties are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.   The Escrow Agent shall have no liability to the Parties, their respective heirs, legal representatives, successors and assigns, or any other party, should any or all of the Escrow Property escheat by operation of law.

Section 4.3.   Notices.   All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by overnight delivery with a reputable national overnight delivery service, or (iv) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five business days after the date such notice is deposited in the United States mail. Any notice given shall be deemed given upon the actual date of such delivery. If notice is given by a party it shall be given at the address for such party set forth below. It shall

7

be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes. In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to NCPA:

James H. Pope, General Manager
Northern California Power Agency
651 Commerce Drive
Roseville, CA 95678
Attention: Denise Daw, Assistant Secretary
Telephone: 916-781-3636
Facsimile: 916-781-4254

If to AltaRock:

AltaRock Energy, Inc.
1330 Worldship Way, Suite 500
Sausalito, CA 94965
Attention: Adrian Foley and Steven McArthur
Telephone: (415) 331-0430
Facsimile: (415) 331-6127

If to the Escrow Agent:

Wells Fargo Bank, National Association
_____
Attention: _____, Corporate Trust and Escrow Services
Telephone:
Facsimile:

**Section 4.4.** **Governing Law.** This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Section 4.5.** **Entire Agreement.** This Escrow Agreement sets forth the entire agreement and understanding of the parties related to the Escrow Property.

**Section 4.6.** **Amendment.** This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

**Section 4.7.** **Waivers.** The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance. A waiver by any party to this Escrow

8

Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

Section 4.8.   Headings.   Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

Section 4.9.   Counterparts.   This Escrow Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

[The remainder of this page left intentionally blank.]

9

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

Northern California Power Agency

Date:  26th May 2009

By
James H. Pope, General Manager

Attest

Denise Tvor, Assistant Secretary

Approved as to Form

Benjamin E. Bayles II
Assistant General Counsel

AfteRock Energy, Inc.

Date:  17th May 2009

By
Donald O'Neal, CEO

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By
Name
Title

S-1

## EXHIBIT A.

### Agency and Custody Account Direction
### For Cash Balances
### Wells Fargo Money Market Deposit Accounts

Direction to use the following Wells Fargo Money Market Deposit Accounts for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Exhibit A is attached.

You are hereby directed to deposit, as indicated below, or as the undersigned shall direct further in writing from time to time, all cash in the Account(s) in the following money market deposit account of Wells Fargo Bank, National Association (Bank):

### Wells Fargo Money Market Deposit Account (MMDA)

The undersigned understands that amounts on deposit in the MMDA are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $100,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $100,000. The undersigned understands that deposits in the MMDA are not secured.

The undersigned acknowledges that it has full power to direct investments of the Account(s) which are held under custody pursuant to this Agreement.

The undersigned understands that it may change this direction at any time and that it shall continue in effect until revoked or modified by the undersigned by written notice to you.


_____
Authorized Representative
AlphaTrade Energy, Inc.


_____
Date

## EXHIBIT B-1

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of AltaRock Energy, Inc. and are authorized to provide notice under the Escrow Agreement referred to below and to initiate and approve disbursements and other transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit B-1 is attached, on behalf of AltaRock Energy, Inc.

Name / Title                                    Specimen Signature

Tim Turner
Senior Vice President                           Signature
Title

Adrian Foley
Vice President                                  Signature
Title

Susan Moriarty
Vice President                                  Signature
Title

Donny Hooke
Controller                                      Signature
Title

Donald O'Shei
Chief Financial Officer                         Signature
Title

_____                                _____
Name                                            Signature
Title

EXHIBIT B-2

CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Northern California Power Agency and are authorized to periodically, under the Escrow Agreement referred to below and to initiate and approve disbursements of escrowed funds to AltaRock Energy, Inc. from the escrow account or accounts established under the Escrow Agreement to which this Exhibit B-2 is attached, on behalf of Northern California Power Agency.

| Name / Title | Specimen Signature |
|---|---|
| James H. Pope<br>General Manager | |
| Ken Speer<br>Assistant General Manager | |
| Earl Meek<br>Manager, Regulatory Compliance | |
| Murray Grande<br>Geothermal Plant Manager | |